1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## CENTRAL DISTRICT OF CALIFORNIA

10
11
12
13
14
15
16

| | |
|---|---|
| THOMAS ATENCIO, an adult individual, and GIAN CATERINE a/k/a/ JOHN CATE, an adult individual, <br><br> Plaintiffs, <br><br> v. <br><br> TUNECORE, INC., a corporation <br><br> Defendant. | Case No. CV 16-1925 DMG <br><br> ORDER RE DEFENDANT TUNECORE, INC.'S MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT [86] |

17
18
19
20
21
22
23

Currently before the Court is Defendant Tunecore, Inc.'s Motion for Summary Judgment or Partial Summary Judgment ("MSJ") [Doc. # 86]. For the reasons that follow, the Court **DENIES** summary judgment on Plaintiffs' breach of contract and quantum meruit claims, and **GRANTS** summary judgment in favor of Defendant on Plaintiffs' fraud claims.

24
25
26
27
28

# I.
## PROCEDURAL BACKGROUND

Plaintiffs filed their initial Complaint [Doc. #1] on March 21, 2016 and their First Amended Complaint on June 16, 2016 [Doc. # 21]. In response to the FAC, Defendant filed motions to dismiss, compel arbitration, and strike. [Doc. ## 26, 27, 28.] The Court granted the motion to dismiss as to several claims, granted the motion to compel arbitration as to others, and denied the motion to strike. *See* September 29, 2016 Order [Doc. # 42.] Plaintiffs then filed their Second Amended Complaint on November 14, 2016 [Doc. # 48], and Defendant filed another motion to dismiss shortly thereafter [Doc. # 49.] The Court granted that motion in part and denied it in part. [Doc. # 63.] Defendant then answered the Second Amended Complaint on September 7, 2017 [Doc. # 66.]

Defendant filed its summary judgment motion on July 24, 2018. [Doc. # 86.] Defendant seeks summary judgment on: (1) Caterine's breach of contract claim, (2) Atencio's breach of contract claim, (3) Caterine's quantum meruit claim, (4) Atencio's quantum meruit claim, (5) Caterine's fraud claim, and (6) Atencio's fraud claim. *See* TuneCore's Notice of Motion for Summary Judgment, or Partial Summary Judgment at ii-iii.

# II.
## FACTUAL BACKGROUND

In 2005, Caterine and Atencio co-founded a company called Your Tunes, which eventually became TuneCore. Decl. of Jason A. Archinaco, Ex. 99, Price Depo. ("Price Depo.") at 13:10-14-:5. The nature and duration of their work with TuneCore is the ultimate focus of the Court's inquiry. Plaintiffs' claims arise from various stock option agreements entered into with TuneCore, and rise and fall with this Court's determination of when, if at all, Plaintiffs ceased their "association" with the company.

In 2015, Believe Digital Media Holdings purchased TuneCore and cancelled all outstanding TuneCore securities, converting them into a right to redeem their value in cash.

Archinaco Decl., Ex. 30 ("Letter of Transmittal").  When Plaintiffs attempted to redeem the cash value of their options, believing them to still be valid, they were told that the options had expired.  Archinaco Decl., Ex. 96, Caterine Depo. ("Caterine Depo.") at 187:6-18[1]; Archinaco Decl., Ex. 95, Atencio Depo. ("Atencio Depo.") at 183:3-10.

## A.   Caterine's Services and Stock Option Agreements

At the time of TuneCore's founding it was low on cash, so it compensated its founders, including Atencio and Caterine, with stock options.  Price Depo. at 14:6-9, 16:20-21:6.  Caterine was the only founder whom TuneCore also compensated with cash.  SUF 1; Price Depo. at 15:10-24.  Between 2006 and 2008, TuneCore and Caterine entered into five stock option agreements.  Declaration of Erica Row, Exs. 16-20.  The parties disagree over the dates of expiration of these agreements.  SUF 2.  It is undisputed, however, that Caterine did not exercise any of his options to purchase stock under the 2006-2008 agreements.[2]  SUF 8.

Caterine acted as TuneCore's Chief Financial Officer ("CFO") from 2007 to 2011.  Caterine Depo. at 62:7-10.  Caterine also provided consulting services for TuneCore during that time.  Price Depo. 82:15-18.  Sometimes he would invoice the company for those services, and sometimes he would not.  Caterine Depo. at 94:15-16.  In 2006, for example,

---

[1] Defendant's objection under Fed. R. Evid. ("FRE") 401 to this portion of Caterine's testimony is overruled.  The Court takes this evidence only for the purpose of establishing that when Caterine attempted to redeem his options for cash, he was rebuffed.  In general, to the extent the Court does not address any of Defendant's evidentiary objections, it is because the Court did not rely on that evidence.  Those objections are overruled as moot.

[2] Caterine and TuneCore also entered into option agreements in 2009 and 2012.  SUF 2, 9.  The Court previously compelled the claims arising from the 2009 and 2012 agreements to arbitration.  They are therefore beyond the scope of this inquiry.  SUF 10; see [Doc. # 42].

Caterine invoiced TuneCore for approximately 25% of the services he provided.  *Id.* at 56:3-6.

Caterine resigned as CFO in January 2011.  SUF 3.  He stated in an email on January 7, 2011 that although he intended to resign as CFO, he expected to "remain involved with the Company."  Archinaco Decl., Ex. 43 ("Resignation Email").[3]  Despite resigning, Caterine claims that he "never became disassociated with the company."  Caterine Depo. at 65:11-12.  After his resignation, Caterine continued to communicate with and provide advice to TuneCore's then-CEO, Jeffrey Price.  Price Depo. at 92:4-19.  According to Price, after Caterine resigned, he continued to provide services relating to "strategy, consultation, networking, pricing, marketing, conferences, all the continual things that he had been doing up to that point in time," and "trying to recruit a buyer for the company."  *Id.* at 94:9-20, 96:17-25; Caterine Depo. at 142:6-25 (Caterine provided "advisory services to [Price], through . . . conversations with shareholders [and] common interaction in the music business").

The last invoice that Caterine sent to TuneCore was dated June 20, 2011.  SUF 4; Archinaco Decl., Ex. 47.  TuneCore did not request invoices from Caterine or make any official offers for Caterine to continue to provide consulting services after that date.  SUF 5, 7.  Still, Caterine claims he continued to provide services to TuneCore, including

---

[3] Defendant objects generally to Exhibit 43 on hearsay and authentication grounds under FRE 801, 802, 803 and 901.  It also objects more specifically on hearsay and relevancy grounds under FRE 801, 802, 803, and 401 to Caterine's statement in Exhibit 43 that he "expect[ed] to remain involved with the Company, but not in a financial capacity, other than to assist with the transition."  Its objections are overruled because Defendant has itself offered the same email evidence.  *See* Row Decl., Ex. 23.  As a rule, "a party offering evidence opens the door and waives its right to object to the entry of that evidence.  The immediate effect of introducing evidence is the loss of the right to exclude the evidence."  *Scheu v. Charter Commc'ns, Inc.*, No. 08-02835 MMM (CWx), 2009 WL 10672161, at *3 (C.D. Cal. Mar. 2, 2009) (collecting cases and denying summary judgment movant's objection on authentication grounds to nonmovant's use of a letter that movant had already submitted into evidence).  Given this ruling, the Court need not address the many other reasons why Defendant's blanket objections are meritless and should be overruled.

referring artists to the company, despite no longer invoicing them. Caterine Depo. at 142:6-17, 90:17-91:4.[4]   Even though he claims to have never disassociated from TuneCore, Caterine believed that it would have been "inappropriate" to invoice TuneCore for his services after his resignation because, at that time, he was "focused on enhancing the value of [his] equity." *Id.* at 142:6-17.

In June 2012, TuneCore granted Caterine another option to purchase 205,784 shares. SUF 9.  This number of shares "represented the number of option shares under the previous stock option agreements that were vested as of the date Caterine resigned as CFO." Ackerman Decl. at ¶ 15.  The grant was "fully vested," and according to Scott Ackerman, then the Chief Operating Officer of TuneCore, "did not depend on any continued service to TuneCore."  *Id.*   Price, however, claims to have recommended that the Board grant Caterine more shares because "Gian put in a significant amount of work into the company and continued to bring it tremendous value even post his resignation as CFO."  Price 85:18-87:3.  By the express terms of the 2012 agreement, it was intended to be "additional" compensation for Caterine, and not "in lieu of" previous compensation.  Row Decl., Ex. 22.  In August 2012, Caterine exercised his option to purchase 100 of the 205,784 shares contained in the 2012 grant.  SUF 11.

TuneCore removed Price as CEO in July 2012.  SUF 23.   Around this time, TuneCore was making efforts to be acquired by another company.  Although TuneCore never officially requested that Caterine endeavor to find TuneCore a buyer, Caterine claims

---

[4] Defendant's objection under FRE 401 is overruled.  The evidence is relevant because Caterine's continued association with TuneCore is more probable with this testimony than without it.

that is exactly what he did.  Caterine Depo. at 53:4-14; *see also* Price Depo. at 97:10-15 (Caterine "put in time and effort into helping a company acquire TuneCore.")[5]

On November 17, 2012, Paul Sieben, counsel for TuneCore, emailed Caterine and stated that his "original option had expired unexercised" and that the Board had decided to grant him the 2012 option as "an additional option."  SUF 12.  Caterine responded to that email by writing "Thanks Paul.  Appreciate the info."  SUF 13.

Then, in February 2013, after Price sued TuneCore for events related to his termination, Caterine told Cogan that Price had "retained [him] to help him sort through his business interests.  TuneCore is not one of them. . . . I have advised [Price] to settle matters with TuneCore."  SUF 14.  At the same time, Caterine and TuneCore were discussing Caterine acting on TuneCore's behalf to settle matters with Price.  Caterine Depo. 94:17-7 (Caterine recalled he "was acting as a mediator, essentially").

In June, 2013, Cogan wrote an email to Caterine and Atencio, stating that the deadline to purchase the outstanding shares from the 2012 agreement was "not until 8/4/13."  Archinaco Decl., Ex. 2, Ex. D at 14. ("Cogan Email").  The email also stated that "[s]imilarly, Mr. Atencio's deadline to exercise the options underlying his 2 grants will not expire until 2016."  *Id.*  Caterine believed that, based on this email, his 2012 options would not expire until August 2013.  Caterine Depo. 170:9-16.  Caterine also believed that, based on Cogan's use of the word "similarly," his 2006-2009 options did not expire until 2016.  Caterine Depo. at 168:19-169:25.[6]

When Believe Digital Media Holdings purchased TuneCore in 2015, Caterine received a letter stating that his outstanding shares, and the shares of every other holder of

---

[5] Defendant's objection under FRE 401 is overruled.  The evidence is relevant because regardless of who asked Caterine to do so, Caterine's efforts to find a buyer for TuneCore make his continued association with TuneCore more probable.

[6] Defendant objects to this evidence under FRE 401, FRE 602, FRE 1002, and California's parol evidence rule.  Defendant's objection under FRE 401 is overruled because this testimony is relevant to

outstanding TuneCore securities, were cancelled and converted to a right of redemption. Transmittal Letter. When he attempted to exercise that right, he received nothing in return. Caterine Depo. at 187:6-18.

## B. Atencio's Services and Stock Option Agreements

Atencio is another co-founder of Your Tunes, TuneCore's predecessor, and received compensation for his work on behalf of the company in the form of stock options early in the life of the company. Price Depo. at 13:10-19, 14:6-9. Specifically, Atencio and Your Tunes executed two agreements, one in February 2006 and one in August 2006. Decl. of Jason A. Archinaco, Ex. 21, 22.

Price and the other founders sought out Atencio to be a part of the company to "trade on [Atencio's] position in the entertainment industry." Atencio Depo. at 44:10-45:7. Price offered Atencio, and Atencio accepted, an arrangement whereby Atencio would provide various services to TuneCore in exchange for stock options. Price Depo. at 144:15-145:22 (listing as the types of services Atencio performed: "Anything that would help with the company. So it could be anything from what do you think of this logo, what font should we use, can you make an introduction to me to so and so . . . can I include your name in a press release . . . could you come with me in a meeting to help legitimize the company or offer additional credibility, could you help raise money").[7] In other words, Atencio saw his job as "being the face of the company, in certain quarters." Atencio Depo. at 54:1-11. Unlike Caterine, Atencio never had an official job title like CFO. Instead, he worked for

---

both the reasonableness of Caterine's reliance on the email and Cogan's intention when he sent it. Defendant's objections under FRE 602, FRE 1002, and the parol evidence rule (Cal. Civ. Proc. Code § 1856) are overruled because the Court takes this testimony not as evidence of the email's actual meaning, but rather as evidence of the effect on the recipient.

[7] Defendant's objection under FRE 401 is overruled. The evidence establishes the type of work Atencio initially did for the company. It is therefore relevant to his breach of contract claim because if he continued similar work in subsequent years, his ongoing association with TuneCore would be more probable.

and with the company by going to conferences, attending meetings, giving interviews, and raising capital.  Atencio Depo. at 54:14-55:3.[8]

TuneCore never compensated Atencio in any way other than the two 2006 stock option agreements.  SUF 21.  Atencio never furnished TuneCore with any invoices for any of his work throughout his relationship with the company, because he claims that invoicing for his services was not part of his custom or practice with TuneCore.  Atencio Depo. at 81:22-82:20.  Nor did Atencio provide reports regarding his consulting services to anyone at TuneCore.  SUF 24.  Atencio never understood his duties on behalf of TuneCore to require furnishing reports.  Atencio Depo. 79:2-7.

After TuneCore terminated Price in 2012, TuneCore made no official request of Atencio to provide any consulting services.  SUF 22.  Nor did TuneCore make any official request of Atencio to locate a buyer for TuneCore.  SUF 25.  But, after Price left TuneCore, Atencio made efforts to open channels of negotiation for InGrooves to potentially acquire TuneCore.  Price asked Atencio to help locate a buyer for TuneCore, and Atencio "provided leads and networking."  Price Depo. at 97:20-24.  In March 2013, Cogan wrote to Atencio and Caterine thanking them for their "efforts to facilitate" the acquisition process and stating that TuneCore was "enthusiastic to consider InGrooves' interest" in purchasing TuneCore.  Archinaco Decl., Ex. 6.

In August 2012, Atencio exercised his option to purchase ten shares of TuneCore stock.  SUF 26.  Atencio claims he did so as a "strategic move" because the rights and obligations of stockholders are "different than an option holder," and because "[i]t's not

---

[8] Defendants objection under FRE 401 is overruled for the same reason set forth in footnote 7, *supra*.

customary to exercise your options until a liquidity event." Atencio Depo. at 138:10-139:2, 65:18-66:8.

Then, as discussed above, Cogan emailed Atencio that his "deadline to exercise the options underlying his 2 grants will not expire until 2016." Cogan Email. Based on this email, Atencio believed that he had until 2016 to exercise his option to purchase the remaining shares. Cogan also intended for Atencio to be able to exercise his options until 2016. Archinaco Decl., Ex. 97, Decl. of Gil Cogan ("Cogan Depo.") at 94:17-20.

When Believe Digital Media Holdings purchased TuneCore in 2015, Atencio received a letter stating that his outstanding shares, and the shares of every other holder of outstanding TuneCore securities, were cancelled and converted to a right of redemption. Transmittal Letter. When he attempted to exercise that right, he received nothing in return. Atencio Depo. at 183:7-14.

## II.
## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Wash. Mut. Inc. v. United States*, 636 F.3d 1207, 1216 (9th Cir. 2011). Material facts are those that may affect the outcome of the case. *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1147 (9th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, Rule 56(c) requires the nonmoving party to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to

interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (quoting Fed. R. Civ. P. 56(c), (e)); *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (*en banc*) ("Rule 56 requires the parties to set out facts they will be able to prove at trial.").  "In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  "Rather, it draws all inferences in the light most favorable to the nonmoving party."  *Id.*

Where the issues before the Court are questions of law, the case is particularly "well suited" for summary judgment.  *Del Real, LLC v. Harris*, 966 F. Supp. 2d 1047, 1051 (E.D. Cal. 2013); *see also Asuncion v. Dist. Dir. Of U.S. Immigration & Naturalization Serv.*, 427 F.2d 523, 524 (9th Cir. 1970) (district court properly resolved motion for summary judgment where issues presented were comprised solely of questions of law).

## III.
## DISCUSSION

### A.    Breach of Contract

Both Plaintiffs allege that they entered into multiple stock option agreements with Defendant between 2006 and 2012.  They further claim that Defendant breached those stock option contracts when Plaintiffs tried in 2015 to exercise their options and Defendant "told [them they] could no longer do so."  SAC at ¶¶ 184, 188.

There is no dispute that, per each stock option agreement's express choice of law provision, New York law controls the question of whether Defendant breached those agreements.  *See* Declaration of Erica B. Row ("Row Decl."), Exhs. 16-20, 34-35 ("This Agreement shall be governed by, and interpreted pursuant to, the laws of the State of New York"); MSJ at 7-9; Plaintiffs' Memorandum of Points and Authorities in Opposition to

TuneCore's Motion for Summary Judgment, or Partial Summary Judgment ("Opp.") [Doc. # 91 at 10-11].

In New York, the elements for breach of contract are: (1) the existence of a contract, (2) the plaintiff's performance under that contract, (3) the defendant's breach of that contract, and (4) resulting damages. *JP Morgan Chase v. J.H. Elec. of New York, Inc.*, 69 A.D.3d 802, 803 (2010). Contracts should be interpreted "so as to give effect to the intention of the parties as expressed in the unequivocal language employed." *Breed v. Ins. Co. of N. Am.*, 46 N.Y.2d 351, 355 (1978). When the contract is a stock option agreement, the party accepting the option must "perform in accordance with the terms of the option agreement." *Tauber v. Bankers Tr. Co.*, 230 A.D.2d 312, 319 (1997); *see e.g., Rockwood v. Vicarious Visions, Inc.,* 44 A.D.3d 1229 (2007). Both Plaintiffs have shown the existence of the stock option agreements and the alleged damages resulting from their inability to exercise their options. The dispute here surrounds the other two elements: whether Plaintiffs performed under the agreements and, if so, whether Defendant breached the contracts. MSJ at 7 ("Plaintiffs' decision not to perform under the Agreements by exercising their options before they expired—not any breach of contract by TuneCore—resulted in their" damages).

Since each Plaintiff entered into multiple agreements, and each Plaintiff's working relationship with Defendant is unique, the Court will discuss each in turn.

### 1.   Caterine's Breach of Contract Claims

Caterine and TuneCore entered into a total of seven stock option agreements between 2006 and 2012.[9] SUF 2, 9. At issue here are five agreements entered into between

---

[9] The Court previously compelled arbitration issues pertaining to the 2009 and 2012 agreements and, consequently, will not resolve them here. *See* September 29 Order at 26. But the Court will still discuss the events surrounding those agreements to the extent they inform the resolution of the claims arising from the 2006-2008 agreements.

2006 and 2008.[10]  Although the various agreements contain language that is both internally inconsistent and inconsistent across agreements, the issue of whether Defendant breached the contracts ultimately turns on the meaning of the word "association" and when, if ever, Caterine ceased "associating" with TuneCore.

Section 1, entitled "Limitations on Exercise of Option if Relationship Continues," of each of the five agreements states that "[i]f the Option Holder has been in continuous association, without interruption, [with] the Company, as an employee, consultant, officer or director from the date hereof through the date of exercise, he may exercise this Option to purchase" the shares specified in the agreement.  Archinaco Decl., Exhs. 36-40.

Section 1 of the January 26, 2006 and August 11, 2006 agreements also states that while "the Option Holder continues to be an employee, consultant, officer, or director of the Company, such rights may be exercised up to and including the date which is ten (10) years from the date this Option is granted."  Archinaco Decl., Exhs. 36-37.  The same provision of Section 1 in the April 25, 2007, October 17, 2007 and June 16, 2008 agreements states, however, that while "the Option Holder continues to be a Service Provider of the Company, such rights may be exercised up to and including the date which is ten (10) years from the date this Option is granted."  Archinaco Decl., Exhs. 38-40.

---

[10] Although Defendant states that five agreements are at issue, and Caterine does not dispute that number, the record is not entirely clear as to which agreements these are.  Defendant states that they are two 2006 agreements, one 2007 agreement, and two 2008 agreements.  MSJ at 9.  Defendant has submitted into the record, however, one agreement dated January 26, 2006, two agreements (which appear to be duplicates) dated August 11, 2006, one agreement dated October 17, 2007, and one agreement dated June 16, 2008.  Row Decl., Exhs. 16-20.  Caterine, on the other hand, agrees that five agreements are at issue, but submitted into the record one agreement dated January 26, 2006, one agreement dated August 11, 2006, one agreement dated April 25, 2007, one agreement dated October 17, 2007, and one agreement dated June 16, 2008.  Archinaco Decl., Exhs. 36-40.  Because this discrepancy does not change Court's analysis of the issues, the Court will assume that Defendant inadvertently submitted a duplicate August 11, 2016 agreement in place of the April 25, 2017 agreement and then inadvertently mis-described the dates of those agreements in its motion papers.

Section 3, entitled "Termination of Relationship," of the January 26, 2006 and August 11, 2006 agreements states that "[i]f the Option Holder ceases to be associated with the Company as an employee, consultant, officer, or director other than by reason of death, this Option shall terminate thirty (30) days after the date such association terminates." Archinaco Decl., Exs. 36-37. On the other hand, Section 3 of the April 25, 2007, October 17, 2007, and June 16, 2008 agreements states that "[i]f the Option Holder ceases to be associated with the Company as a Service Provider other than by reason of death or disability, this Option shall terminate three (3) months after the date such association terminates." Archinaco Decl., Exs. 38-40.

Under New York law, the ambiguity that these provisions' inconsistencies create as to the precise exercise deadline for each agreement is enough by itself to preclude summary judgment on the contract claims. *LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205 (2d Cir. 2005) (under New York law, when the meaning of a contract is ambiguous "a question of fact is presented which cannot be resolved on a motion for summary judgment"); *Malmsteen v. Universal Music Grp., Inc.*, 940 F. Supp. 2d 123, 131 (S.D.N.Y. 2013) (Under New York law, "[g]enerally, summary judgment is appropriate in a contract dispute only where the contract's terms are unambiguous, whereas interpretation of ambiguous contract language is a question of fact to be resolved by the factfinder.").

Even assuming that the inconsistencies do not create an ambiguity that is fatal to Defendant's argument that the agreements expired by their own terms, the Court concludes that a genuine issue of material fact persists as to whether Caterine continued to associate with TuneCore such that his options never expired.

Defendant contends that Caterine's options expired well before the time he attempted to exercise them in 2015. MSJ at 9. Its theory is that all five option agreements terminated in 2011, because Caterine ceased his continuous association with TuneCore when he resigned as its CFO (or shortly thereafter). *Id.* at 10; Row Decl., Ex. 25 (email

from Caterine saying that he "left TuneCore in January of 2011"). In support, Defendant cites *Rockwood v. Vicarious Visions, Inc*, which dealt with an option agreement stating that "the option expires 90 days after the participant's Date of Termination." 44 A.D.3d 1229, 1230 (2007). That option defined "Date of Termination" as "the first day . . . on which the Participant's employment with [defendant] . . . terminates for any reason." *Id.* The *Rockwood* court held that the option expired 90 days after the plaintiff terminated his "compensated relationship with defendant by leaving its board of directors." *Id.*

While the option agreement's language in *Rockwood* was clear, the language in Caterine's stock agreements is decidedly not. Rather than stating, like in *Rockwood*, that termination occurs when "employment" ends, the termination language in Section 3 of Caterine's agreements states that termination occurs when Caterine "ceases to be associated" with the company (either as an "employee, consultant, director, or officer" or as a "Service Provider," depending on the agreement). Archinaco Decl., Exs. 36-40 at Section 3. *Rockwood* also provides an easily-understood definition of "employment." *Id.* (the term employment "describes any relationship in which one person provides services for another in exchange for compensation."). But as this case demonstrates, the definition of "association" with TuneCore as a "consultant" is considerably more ambiguous. *See Reyes v. Metromedia Software, Inc.*, 840 F. Supp. 2d 752, 755 (S.D.N.Y. 2012) (ambiguity exists when a provision is "reasonably susceptible to more than one reading") (citing *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 572 (2d Cir.1991).

While in *Rockwood* it was clear that the plaintiff had ended his working relationship with the defendant, there remain genuine disputes over whether Caterine's "association" with TuneCore in fact ended when he resigned. Caterine undoubtedly ended his stint as CFO in January of 2011, but in his resignation email he stated that he intended "to remain involved with the Company, but not in a financial capacity, other than to assist with the transition." Resignation Email. Defendant points to the fact that Caterine twice invoiced TuneCore at an increased hourly rate for services after his resignation, but never invoiced

-14-

TuneCore after June of 2011, as evidence that his association ended that year.  MSJ at 10-11.  But Caterine claims to have had a habit throughout his time as CFO of providing consulting services to TuneCore and not invoicing the company for his work.  Caterine Depo. at 135:14-136:4.   Price also testified that Caterine's work on behalf of TuneCore continued after his resignation.  Price Depo. at 92:4-93:12, 93:24-94:20 (stating that Caterine helped with "strategy, consultation, networking, pricing, marketing, conferences").  Even after Price left the company, Caterine claims to have made efforts to locate buyers for TuneCore when it wanted to be acquired.  Caterine Depo. at 53:25-54:4; *see also* Cogan Depo. at 81:21-82:10 (stating that Plaintiffs "brought in" at least one potential buyer to "see whether the board would be receptive to them").

Defendant also argues that Caterine "understood" that his 2006-2008 option agreements had expired.  MSJ at 11-13.  But the record is murky on that front too. Defendant contends that Caterine conceded his 2006-2008 options had expired in an email exchange with Paul Sieben on November 17, 2012.  In that exchange, Caterine says he "received a 'replacement' document" for his 2012 options and inquires about a "discrepancy" between the number of options in his previous agreements and the number of options in the 2012 agreement.  Row Decl., Ex. 26 (quotes in original).  Defendant takes this to mean that Caterine understood his 2012 option agreement to be an effort by the Board to replace his expired 2006-2008 options with a new 2012 option.  MSJ at 11.  But the plain language of the 2012 option agreement refutes that argument.  It states that "[t]he Option has been granted to the Participant *in addition to, and not in lieu of,* any other form of compensation otherwise payable or to be paid to the Participant."  Row Decl., Ex. 22.

In response to Caterine's email, Sieben states that "your original option had expired unexercised."  Row Decl., Ex. 26.  Caterine then responds "Thanks Paul.  Appreciate the info.  Have a great Thanksgiving."  *Id.*  While Defendant argues that Caterine's response is an implicit concession that his options had expired, MSJ at 11, Caterine argues that his matter-of-fact response was simply an effort to avoid conflict with Sieben, and not an

admission of anything.[11]  Even assuming for the sake of argument that Caterine had subjectively understood that his 2006-2008 options had expired, Defendant fails to show the significance of that understanding.  After all, "one party's postcontractual subjective understanding of the terms of the [contract] . . . [is] not probative as an aid to the interpretation of the contract nor, by logical extension, does it control the interpretation of the contract."  *Sherwood v. Town of Lancaster*, 75 A.D.3d 1161, 1163 (2010) (internal quotes omitted).

In conclusion, the work relationship between Caterine and TuneCore remains fraught with ambiguity.  There is certainly evidence showing that Caterine left the company when he resigned as CFO, but there is also evidence indicating that Caterine continued to provide consulting services unrelated to his duties as CFO well after 2011.  At this stage, the Court cannot weigh the credibility of this conflicting evidence and must draw any reasonable inferences in favor of the nonmoving party.  *Soremekun Inc.*, 509 F.3d at 984. In light of that, the Court concludes that genuine disputes of fact exist as to whether Caterine's ill-defined working relationship with TuneCore continued past 2011 and, if it did, whether it qualified as an "association" with TuneCore such that Caterine's stock option agreements never expired.  At the very least, it is possible that a "reasonable jury could return a verdict" for Caterine on his breach of contract claims.  *Anderson,* 477 U.S. at 248.  Therefore, summary judgment as to Caterine's breach of contract claims is **DENIED**.

### 1.   Atencio's Breach of Contract Claims

Defendant also argues that Atencio's options expired on August 20, 2012.   MSJ at 13-14.  Atencio and TuneCore entered into two stock option agreements, one in February

---

[11] Caterine's stated reasons for avoiding conflict with Sieben appear to be that (1) Caterine chose to rely on Price's reassurance that the 2012 option was an additional option, not a replacement option, (2) that Sieben was engaged in an effort to alter TuneCore's capitalization table to benefit another of his firm's clients, and (3) that Caterine had already had this conversation with Sieben and "didn't want to get into it with him again."  SUF 239-46; Caterine Depo. at 164:5-165:10.

of 2006 and one in August of 2006.   Row Decl., Exs. 34, 35.   Unlike Caterine's arrangement with TuneCore, which involved compensation in cash and stock options, TuneCore compensated Atencio for his contributions to the company in stock options only. Atencio Depo. at 45:20-23.

Atencio's agreements contain similar language to Caterine's.   Section 1 of his agreements states "[i]f the Option Holder has been in continuous association, without interruption, [with] the Company, as an employee, consultant, officer or director from the date hereof through the date of exercise, he may exercise this Option to purchase" the shares specified in the agreement.   Row Decl., Exs. 34, 35.   That section also states that while "the Option Holder continues to be an employee, consultant, officer, or director of the Company, such rights may be exercised up to and including the date which is ten (10) years from the date this Option is granted." *Id.*  Also like Caterine's agreements, Section 3 of Atencio's agreements states that "[i]f the Option Holder ceases to be associated with the Company as an employee, consultant, officer, or director other than by reason of death, this Option shall terminate thirty (30) days after the date such association terminates." *Id.*

Defendant's theory on Atencio's claims is that Atencio ceased providing consulting services to TuneCore on July 20, 2012, the date the company terminated Price, and that Atencio's options therefore expired thirty days afterwards, on August 20, 2012.   MSJ at 13-14.   Atencio, on the other hand, argues that he continued to associate with and provide services to Defendant through 2015.   Opp. at 19; Atencio Depo. 160:9-18.

Unlike Caterine, Atencio never held a position at TuneCore with an official title and job description.   From the company's founding, Atencio's contribution was an amorphous combination of instant credibility, industry know-how, strategic thought, and useful relationships, with no particular metrics for performance.   Price Depo. at 51:6-10; Atencio Depo. at 44:10-45:7, 28:6-18.   Atencio's understanding was that Price hired him to be the "front person" or the "face" of the company.   Atencio Depo. at 54:7-11.   Because of the

nebulous nature of Atencio's work for TuneCore, the question of whether he ceased his association with TuneCore at any point before he attempted to exercise his options is even less clear than whether Caterine ceased his association.

Defendant argues that after Price's termination, no one at TuneCore asked Atencio "to perform any services," Atencio never "reported to anyone at TuneCore," and Atencio never submitted any work product or invoices to TuneCore. MSJ at 7; Ackerman Decl. at ¶¶ 8-9 (stating that as TuneCore CEO, he was unaware of TuneCore using Atencio as a consultant after 2012). But being asked to perform services, reporting to superiors at TuneCore, submitting work product, or sending invoices to TuneCore do not appear to have been Atencio's custom or practice at any point during his relationship or association with the company. Atencio Depo. at 24:22-25:6, 135:5-7[12]; Price Depo. at 71:23-72:13. In other words, Plaintiff contends that Atencio's association with TuneCore did not begin and end with Price. Opp. At 19.

In fact, Atencio states that after TuneCore removed Price as CEO, Atencio began to "promote" TuneCore "more than ever" and did so "for TuneCore's benefit." Atencio Depo. at 120:6-22. He claims that, like Caterine, he assisted the company in finding potential merger partners. *Id.* at 91:13-20[13]; *see also* Cogan Depo. at 82:3-10.

He also states that as of 2015, he believed he was still "fulfilling the role that [he] started with the company" and acting as the "face of the company." *Id.* at 158:9-18. Beyond Defendant's argument that TuneCore never formally asked Atencio to do so, it presents little evidence that this promotional role was not simply the continuation of the

---

[12] Defendants' objection under FRE 401 is overruled. The evidence is probative of the type of work Atencio initially did for the company. It is therefore relevant to his breach of contract claim because if he continued a similar role in subsequent years, his continued association with TuneCore would be more probable.

[13] Defendants' objection under FRE 401 is overruled. The evidence relevant is to his breach of contract claim because if he assisted TuneCore in finding a buyer, Atencio's continued association with TuneCore would be more probable.

role Atencio performed for TuneCore from its inception.  Indeed, Ackerman was not aware of any document informing Atencio he was no longer associated with the company or asking him to cease providing services.  Archinaco Decl., Ex. 94, Ackerman Depo. at 144:10-16.[14]

In sum, Atencio has met his burden under Rule 56 to show that there are "genuine issues for trial" regarding whether Atencio continued to associate with TuneCore up to the time he attempted to exercise his options.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Therefore, the Court **DENIES** summary judgment as to Atencio's breach of contract claims as well.

## B.    Quantum Meruit

Unlike their breach of contract claims, Plaintiffs' share a basis for their quantum meruit claims, so the Court need not address each Plaintiff's claims individually.  Plaintiffs argue that they rendered services for TuneCore over the course of several years.  Because they were unable to redeem their stock options for cash after the merger, they were never compensated for those services.  Therefore, Plaintiffs contend that TuneCore was unjustly enriched and Plaintiffs are entitled to equitable compensation.  *See* Opp. at 2-4.

### 1.    The Quantum Meruit Claims[15]

Quantum meruit is an "equitable remedy implied by the law under which a plaintiff who has rendered services benefiting the defendant may recover the reasonable value of

---

[14] Defendants' objection under FRE 401 is overruled.  This testimony is relevant because the lack of documentation of Atencio's disassociation from TuneCore makes his continued association more probable.  This is true even though his stock option provisions were silent as to whether TuneCore had to give Atencio notice of his termination.

[15] The parties make their quantum meruit arguments almost entirely under California and Ninth Circuit law.  Plaintiffs lay out an interpretation of the legal standard for quantum meruit claims under New York law, while admitting that "counsel has not performed fully exhaustive research on New York law." Opp. at 2 n.1.  Defendant cites more New York law to rebut Plaintiffs' cases and claims that regardless of which state's law controls, the result is the same.  The Court does not read either party's briefing to assert

those services when necessary to prevent unjust enrichment of the defendant." *In re De Laurentiis Entm't Grp. Inc.*, 963 F.2d 1269, 1272 (9th Cir. 1992). To maintain a quantum meruit claim, a plaintiff must show that "[1] the plaintiff rendered services to the defendant's benefit; and [2] the defendant would be unjustly enriched if the plaintiff was not compensated." *King v. Nat'l Gen. Ins. Co.*, 129 F. Supp. 3d 925, 942 (N.D. Cal. 2015). Quantum meruit is not based on "the intention of the parties, but rather on the provision and receipt of benefits and the injustice that would result to the party providing those benefits absent compensation." *De Laurentiis Entm't Grp. Inc.*, 963 F.2d at 1272. As equitable remedies, quantum meruit and unjust enrichment fall within the discretion of the court. *Miller for & on Behalf of N.L.R.B. v. California Pac. Med. Ctr.,* 991 F.2d 536, 544 (9th Cir. 1993) ("all or almost all equitable remedies are discretionary"); *see also Philp v. Macri*, 261 F.2d 945, 947 (9th Cir. 1958).

With regard to the first element, Plaintiffs' services rendered to TuneCore, it is undisputed that Caterine and Atencio both performed extensive work for TuneCore since the company's founding. The parties only dispute when, if ever, that work and Plaintiffs' resulting association ceased. Defendant does not argue that it never benefitted from that work—it argues only that it never made any requests for Plaintiffs' services after their purported disassociations from TuneCore. *See* MSJ at 14-15. Even if that is the case, it does not disprove that Defendant benefitted from the services Plaintiffs rendered before and after the alleged disassociation. Plaintiffs have therefore satisfied the first element.

The Court also concludes that TuneCore has failed to show it would not be unjustly enriched absent compensation for Plaintiffs. Whether or not Plaintiffs' stock option agreements expired before they attempted to exercise them, the provisions controlling Plaintiffs' ability to exercise those options—in other words, the provisions controlling Plaintiffs' ability to actually receive their compensation—are highly ambiguous. *See*

---

that New York law applies to Plaintiffs' quantum meruit claims, and therefore will analyze the issue under California law.

Section II.A, *supra*.  Plaintiffs were only eligible to be compensated if they continued to associate with TuneCore, which, as discussed above, is in and of itself an ill-defined and ambiguous concept.  Yet, Defendant is not aware of having given Plaintiffs any notice that they had been "disassociated," terminated, or in any way separated from the company.  *See* Ackerman Depo. at 100:14-21, 103:11-25, 144:10-16.  The Court concludes that equitable considerations militate towards allowing Plaintiffs to pursue quantum meruit as an alternative theory of recovery, because the ambiguity of the contracts themselves may have caused Plaintiffs to be unable to receive compensation.  The analysis might be different if the option agreements gave clear and unambiguous notice to Plaintiffs of when their exercise windows expired, but that is not the case here.

Defendant cites to *Hedging Concepts, Inc. v. First Alliance Mortgage Co.*, 41 Cal. App. 4th 1410, 1423 (1996), for the proposition that when a contract exists between the parties, that contract precludes quantum meruit recovery even when one party was not compensated due to the nonoccurrence of a contingency.  Defendant argues that, similarly, Plaintiffs' timely exercise of their options was a contingency that never occurred.  But *Hedging Concepts* is distinguishable because, there, the contingency that never came to fruition was one party's performance of the purpose of the contract.  *See id.* at 1418-19 (describing contract wherein if an individual successfully "arranged securitizations for First Alliance . . . he would be paid an attractive commission.  If he was not successful, he would be paid nothing.").  Here, on the other hand, the purpose of the parties' agreement was that Plaintiffs would perform services for the company in exchange for compensation through stock options.  Plaintiffs unquestionably performed services on TuneCore's behalf, but as a practical matter remain uncompensated because of a lack of clarity as to the deadline for exercise of the options.  This transforms Plaintiffs' stock option compensation into a game of "gotcha."  The Court therefore concludes that, even if Plaintiffs cannot

recover under their stock agreements, Defendants have failed to show that Plaintiffs should not be entitled to collect in equity fair compensation for their services.

Defendant also argues that Plaintiffs' quantum meruit claims are barred by the two-year statute of limitations. *Vishva Dev, M.D., Inc. v. Blue Shield of California Life & Health Ins. Co.*, 2 Cal. App. 5th 1218, 1223 (Ct. App. 2016), *review denied* (Nov. 9, 2016) ("The statute of limitations for quantum meruit claims is two years."). Defendant admits, however, that under California law the limitations period does not begin to run until "termination of services" occurs. MSJ at 18 (citing *Maglica v. Maglica*, 66 Cal. App. 4th 442, 452-54 (1998)). As explained above, however, the timing of any "termination of services," if it occurred at all, remains an open factual question. Thus, the Court cannot determine, as a matter of law, that the statute of limitations bars Plaintiffs' claims.

Finally, Defendant argues that because Plaintiffs rendered their services to TuneCore "gratuitously," quantum meruit cannot lie. Reply at 8-9 (citing *Huskinson & Brown v. Wolf*, 32 Cal. 4th 453, 458, 84 P.3d 379, 381 (2004) ("Quantum meruit refers to the well-established principle that the law implies a promise to pay for services performed under circumstances disclosing that they were not gratuitously rendered.")). Here, there is uncontroverted evidence that Plaintiffs intended the stock options to serve as compensation for their services. Price Depo. at 14:6-9, 16:20-21:6; Atencio Depo. at 45:20-23. The parties' agreement that Plaintiffs would provide services for Defendant in exchange for compensation through options makes the arrangement non-gratuitous. At the very least, this is sufficient to create a genuine dispute of material fact as to whether Plaintiffs intended their work to be gratuitous. Defendant counters that quantum meruit requires that *both* parties expect the services rendered to be non-gratuitous, Reply at 9, but Plaintiffs have also presented admissible evidence showing that TuneCore intended Plaintiffs to be compensated through their stock options at least in the years before 2012, if not after. *See*

*e.g.*, Price Depo. at 13:10-19, 14:6-9, 85:18-87:3.  Thus, on this argument, too, Plaintiffs have shown the existence of a genuine dispute of material fact.

### 2.    Plaintiffs' Potential Recovery in Quantum Meruit

Although Plaintiffs' quantum meruit theory may proceed, they may not recover in quantum meruit if their breach of contract theory succeeds.  The reverse is also true.  *See De Laurentiis Entm't Grp. Inc.,* 963 F.2d at 1272 n. 3 ("As long as [plaintiff] seeks *only one recovery*, it is entitled to pursue both contract claims and quantum meruit claims arising out of the same transaction.") (emphasis added).

Defendant argues, however, that any such recovery must be limited to the value of their options.  MSJ at 10-11.  It cites *Chodos v. Borman* for the proposition that quantum meruit recovery is limited to the value of the agreement between the parties.  227 Cal. App. 4th 76, 100 (2014).  The Court agrees that, in a case such as this, where the existence of a contract governing compensation is undisputed,[16] but the ambiguity in the provisions controlling how and when Plaintiffs would receive that compensation may have caused Plaintiffs' harm, Plaintiffs should only be permitted to recover in quantum meruit the reasonable value of their services up to the amount they would otherwise be permitted to recover in contract.  The Court finds this case analogous to *Chodos*, where the Court of Appeal reversed a trial court's decision awarding an attorney a quantum meruit recovery five times larger than the amount the parties orally agreed to.  *Id.* at 106.  The court reasoned that it would be inequitable to use quantum meruit to award the attorney "a rate

---

[16] The parties agree that Plaintiffs and TuneCore had express stock option agreements in place.  They also agree that those agreements governed Plaintiffs' compensation.  See Opp. at 12 ("Plaintiffs have established the existence of agreements with TuneCore"); Defendant TuneCore's Reply in Support of Motion for Summary Judgment, or Partial Summary Judgment ("Reply") [Doc. # 94 at 4.]  Furthermore, both parties' evidence supports that understanding.  SUF 21 (Plaintiffs stating that "Atencio received only stock options to compensate him" and that Atencio's "entire incentive and his only way of being compensated" were through stock options); Caterine Depo. at 56:7-11 (Caterine states he had no understanding that he "would be compensated for [his] services outside of the stock option agreement, and the $90 an hour discounted rate"); Atencio Depo. at 45:18-23; Price Depo. 51:6-9.

well in excess of the rate he initially agreed to accept." *Id.* at 102; *see also Maglica v. Maglica,* 66 Cal. App. 4th 442, 451 (1998), *as modified on denial of reh'g* (Sept. 28, 1998) (holding that courts cannot "use quantum meruit to impose a highly generous and extraordinary contract that the parties did not make").  It would likewise be inequitable to award Plaintiffs a quantum meruit recovery exceeding the value of the options they agreed to accept as compensation for their services.

Therefore, to the extent Plaintiffs succeed on their quantum meruit claim, they will be limited to recovering the reasonable value of their services up to the value of their stock option agreements.  They may recover less, if the jury determines that the reasonable value of their services is less than the contracts' value, but no more.  In light of the foregoing, the Court **DENIES** Defendant's motion for summary judgment on the quantum meruit claim.

## C.    Fraud Claims

Plaintiffs each allege two separate fraud causes of action against Defendant:  one arising from an email sent by Cogan to Plaintiffs on June 11, 2013, and another arising from TuneCore's alleged "scheme" to induce Plaintiffs to "surrender their equity" back to the company during the 2015 merger.  Opp. at 19-22.  To establish fraud, a plaintiff must show "a false representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003).

### 1.    The June 11, 2013 Cogan Email

In June of 2013, Caterine reached out to Cogan and inquired about "an extension on the exercise of [Plaintiffs'] options," which Caterine stated he believed would expire "in a

matter of days." Declaration of Gill Cogan, Ex. 13 ("Cogan Email"). Cogan responded that:

> TuneCore granted you an option on 6/21/12 to purchase 205,784 shares of Tunecore Common Stock at a price of $.33 per share. You exercised your option to purchase 100 shares from this grant. The deadline to purchase the other 205,684 shares is not until 8/4/13, rather than a matter of days. . . . Similarly, Mr. Atencio's deadline to exercise the options underlying his 2 grants will not expire until 2016.

*Id.* Plaintiffs allege that they both relied on this email as an assurance that they had until 2016 to exercise their options. SAC at ¶ 230. They also claim that they had verbal conversations with Cogan in which he again assured them that they had until 2016 to exercise their options. Opp. at 20.

Neither Plaintiff has done enough to avoid summary judgment on this claim. First, any reliance Caterine may have placed on the Cogan Email related to his 2006-2008 options was unreasonable as a matter of law.[17] Reasonable reliance "is judged by an objective standard" and can "be decided as a matter of law." *United Guar. Mortg. Indem. Co. v. Countrywide Fin. Corp.*, 660 F. Supp. 2d 1163, 1189 (C.D. Cal. 2009); *All. Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995) ("whether a party's reliance was justified may be decided as a matter of law").

Cogan's email describes the grant, partial exercise, and expiration of Caterine's 2012 option. It makes no mention of Caterine's other options. It says that Atencio's options would expire in 2016, but does not state that any of Caterine's options were set to expire in 2016. Even if Caterine did subjectively interpret the 2016 expiration language to refer

---

[17] Under "California law the terms 'reasonable reliance' and 'justifiable reliance' may be used interchangeably to refer to the element of reliance in a fraud or deceit cause of action." *Manderville v. PCG&S Grp., Inc.*, 146 Cal. App. 4th 1486, 1499 n.6 (2007).

to his options, a 2016 expiration date would run counter to the express terms of three of Caterine's agreements. Notwithstanding the ambiguity as to when he might have disassociated from TuneCore, all his agreements were subject to a 10-year exercise window, but he executed three of them after 2006. Row Decl., Exs. 18-20 ("such rights may be exercised up to and including the date which is ten (10) years from the date this Option is granted"). Assuming Caterine never disassociated from TuneCore and those agreements remained valid for the entirety of their window, those agreements would have expired in 2017 and 2018, not 2016.

The reasonable reliance standard in this context is also "calibrated to the plaintiff's own intelligence and information." *United Guar. Mortg. Indem. Co.*, at 1189. It does "not bind a court to assume a plaintiff has the "minimum knowledge of a hypothetical, reasonable man." *Id.* By Caterine's own measure of himself, he is a successful CFO and industry veteran. SUF 16. And he was aware that he and Atencio had different agreements with slightly different terms. A man of his experience and expertise cannot have reasonably relied on Cogan's email for information about his 2006-2008 options when the email made no mention of those options whatsoever. The Court concludes that his reliance was objectively unreasonable.

Caterine's fraud claim arising from Cogan's statements also fails for a different reason: he fails to show Cogan had the intent to defraud. *See Vess*, 317 F.3d at 1105 (listing intent to defraud as a necessary element of fraud). In fact, Plaintiffs acknowledge that Cogan testified that it was never his "intent in 2013 to mislead anyone." Opp. at 20. Cogan also testified that he intended at the time that Plaintiffs be compensated through their stock options. Cogan Depo. at 94:17-95:13. If Cogan had a fraudulent intent, he would have assured Caterine of his ability to exercise his options while intending that Caterine *not* be compensated. Plaintiff has not presented any evidence to contradict Cogan's testimony or the inference it creates that Cogan simply made a mistake about the details of Plaintiffs' option agreements. As the Court is not required to parse the record on

its own in search of evidence that supports Plaintiffs' arguments, the Court concludes Defendant has established the absence of a genuine dispute of fact as to Cogan's intent to defraud in 2013. *See Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (holding that a court "is not required to comb the record to find some reason to deny a motion for summary judgment . . . [i]f a party wishes the court to consider" evidence, "the party should bring [it] to the attention of the court.").

Atencio's 2013 fraud allegations are similarly deficient. Although Cogan's email does explicitly state that Atencio had until 2016 to exercise his options, meaning that Atencio's reliance on that statement was potentially reasonable, he also fails to show that Cogan intended to defraud him through that email or other conversations. Therefore the Court **GRANTS** summary judgment in favor of Defendant on Plaintiffs' 2013 fraud claims.

## 1.    The 2015 "Scheme" and Letter of Transmittal

Plaintiffs further allege that the Letter of Transmittal they received from Defendant in 2015 was part of a broader "scheme" to fraudulently prevent them from exercising their stock options. Opp. at 20-22. The letter states in relevant part that "[p]ursuant to the Merger Agreement . . . each Security of [TuneCore] owned by [Plaintiffs] was automatically cancelled and converted as of the effectiveness of the Merger into the right to receive a payment in cash with regard to such outstanding Securities." Letter of Transmittal. The letter defined "Security" to include both stock and stock options. *Id.*

Plaintiffs claim TuneCore's scheme went something like this: After Believe Digital Holdings purchased TuneCore, TuneCore was aware that Plaintiffs' options had not expired, but the company wanted to consolidate as much of its stock as possible. At least one executive at TuneCore decided to use the Transmittal Letter as a pretense for inducing

Plaintiffs to remit their option certificates to TuneCore, even though TuneCore never intended to honor the terms of the certificates or the letter.  Opp at 20.

Defendant argues that these events do not rise to the level of fraud because the Letter of Transmittal never made any misrepresentation to Plaintiffs.  MSJ at 24.  Instead, Defendant argues that the letter was a form letter sent to all TuneCore securities holders, informing them that all their shares of TuneCore stock had been cancelled, and that any valid and outstanding shares had been converted into a right of redemption in cash.  MSJ at 24; Ackerman Decl. at ¶ 21.  The Court agrees.

The first element of any fraud claim is a misrepresentation by the defendant.  *Lazar v. Super. Ct.*, 12 Cal. 4th 631, 638.  In Plaintiffs' own words, they "have based their 2015 fraud claim" on the theory that the Letter of Transmittal made misrepresentations that induced them to surrender their securities.  Opp. at 22.  But they have provided no legal authority suggesting that a form letter, sent to all of a company's securities holders, that simply spells out those securities holders' rights in the wake of a merger can form the basis for a fraudulent misrepresentation.  *See id.*  There is no indication that this letter was any different from the letters every other securities holder received.[18]  Nor did it make any representations that Plaintiffs still possessed valid stock options.  For that matter, it made no mention of Plaintiffs at all.  All it said was that anyone with "outstanding Securities" would be able to redeem the value of those securities in cash.  Letter of Transmittal.

While Plaintiffs cite to evidence in the record that arguably supports their allegation that TuneCore improperly cancelled Plaintiffs' stock options, none of it is material to establishing the misrepresentation necessary to support a fraud claim.  *Anderson*, 477 U.S. at 248 (factual disputes are immaterial unless they "might affect the outcome of the suit

---

[18] Indeed, even if TuneCore properly cancelled Plaintiffs' options during the merger process, Plaintiffs still would have received the Letter of Transmittal because by that point they were shareholders (as opposed to merely option holders).  Atencio had exercised his option to purchase 10 shares and Caterine had exercised his option to purchase 100 shares under his 2012 agreement.  SUF 11, 26.

under the governing law").  In sum, Plaintiffs have failed to show the existence of a material factual dispute over whether TuneCore's Letter of Transmittal was a misrepresentation. The Court therefore **GRANTS** summary judgment in favor of Defendant on Plaintiffs' 2015 fraud claim.

### IV.
### CONCLUSION

In light of the foregoing, the Court:

1. **DENIES** summary judgment on Plaintiffs' breach of contract and quantum meruit claims; and

2. **GRANTS** summary judgment in favor of Defendant on Plaintiffs' fraud claims.

**IT IS SO ORDERED.**

DATED:  September 21, 2018

_____
DOLLY M. GEE
UNITED STATES DISTRICT JUDGE